BARKETT, Circuit Judge,
Dissenting from the Denial of Rehearing En Banc:
Lofton v. Sec. of Dep’t of Children & Family Services, 358 F.3d 804 (11th Cir.2004), finds constitutional 1977 Fla. Laws, ch. 77-140, § 1, Fla. Stat. § 63.042(3) (2003), which provides that “[n]o person eligible to adopt under this statute may adopt if that person is a homosexual.” [1] Florida is the only state in the union to have such a categorical statutory prohibition targeted solely against homosexuals.[2] This provision finds, as a matter of law, hundreds of thousands of Florida citizens unfit to serve as adoptive parents solely because of constitutionally protected conduct. There is no comparable bar in Florida’s adoption statute that applies to any other group. Neither child molesters, drug addicts, nor domestic abusers are categorically barred by the statute from serving as adoptive parents. In a very real sense, Florida’s adoption statute treats homosexuals less favorably than even those individuals with characteristics that may pose a threat to the well-being of children.
While Florida claims that it has singled out homosexuals because it wishes to limit adoptions to married couples, the statute in this case says absolutely nothing about married couples. In fact, Florida’s adoption statute expressly, provides for single *1291 persons to adopt. A full twenty-five percent of adoptions out of foster care in Florida are by single people; in the district covering Miami-Dade County, this figure is over forty percent.[3] This is only the first and most glaring of numerous gaps between the state’s ban on homosexual adoption and its purported justification. Under Florida law, for example, single persons who are homosexuals but are “not practicing” may adopt.[4] Florida also permits homosexuals (whether sexually active or not) to serve as foster parents on a 'permanent basis,[5] and the state acknowledges that such foster care placements involve a state of “de facto permanency.”[6] Finally, Florida permits homosexuals to serve as legal guardians.[7]
The ban on homosexual adoption at issue here violates the Equal Protection Clause of the Fourteenth Amendment because Florida’s proffered rational basis is expressly refuted by the state’s own law and practice and because a class consisting of all homosexual citizens was targeted solely on the basis of impermissible animus. Thus, as argued in Section I below, even under the lowest standard of review — rational basis — Florida’s statute fails to survive equal protection analysis under the Supreme Court’s precedents in Eisenstadt,[8] Moreno,[9] Cleburne,[10] and Romer.[11]
The state’s ban on homosexual adoption also violates the Due Process Clause by conditioning access to the statutory privilege of adoption on surrender of the right to engage in private intimate sexual conduct protected by Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). As argued in Section II below, in upholding the Florida statute, Lofton directly conflicts with an entire body of substantive due process jurisprudence, culminating in the Supreme Court’s decision in Laivrence.
Because of these equal protection and substantive due process precedents, and in light of the “exceptional importance” of the issues raised, this decision clearly warrants en banc review. 11th Cir. R. 35-3 (en banc consideration is warranted for “precedent-setting error[s] of exceptional importance” or for opinions that are “allegedly in direct conflict with precedent of the Supreme Court or of this circuit”).
I. EQUAL PROTECTION

A. The Rational Basis Test Established in the Analogous Cases of Romer, Cleburne, Moreno, and Ei-senstadt Requires that We Invalidate this Statute.

The Equal Protection Clause “is essentially a direction that all persons similarly situated should be treated alike.” Cleburne, 473 U.S. at 439, 105 S.Ct. 3249. Yet because of the practical need for legislators to draw distinctions among groups, a classification that neither burdens a fundamental right nor targets a suspect class *1292 will be analyzed using rational basis scrutiny, which means that it will be upheld provided that it “bears a rational relation to some legitimate end.” Romer, 517 U.S. at 631, 116 S.Ct. 1620. Although this is a deferential form of review, a court must still identify legitimate state interests and find a “relationship between the classification adopted and the object to be attained.” Id. at 632, 116 S.Ct. 1620.
As will be explained more fully below, the classification at issue in this case burdens personal relationships and exudes animus against a politically unpopular group. Under these circumstances, statutes have consistently failed rational basis review. Summarizing these cases, Justice O’Con-nor observed in her concurrence in Lawrence that
[l]aws such as economic or tax legislation that are scrutinized under rational basis review normally pass constitutional muster, since the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes. We have consistently held, however, that some objectives, such as a bare ... desire to harm a politically unpopular group, are not legitimate state interests. When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.
Lawrence, 123 S.Ct. at 2484-85 (O’Connor, J., concurring) (internal citations and quotation marks omitted) (emphasis added). Justice O’Connor went on to explain how this principle has been applied by the Court in prior equal protection cases:
We have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships. In Department of Agriculture v. Moreno, for example, we held that a law preventing those households containing an individual unrelated to any other member of the household from receiving food stamps violated equal protection because the purpose of the law was to discriminate against hippies. The asserted governmental interest in preventing food stamp fraud was not deemed sufficient to satisfy rational basis review. In Eisenstadt v. Baird, we refused to sanction a law that discriminated between married and unmarried persons by prohibiting the distribution of contraceptives to single persons. Likewise, in Cleburne v. Cleburne Living Center, we held that it was irrational for a State to require a home for the mentally disabled to obtain a special use permit when other residences — like fraternity houses and apartment buildings — did not have to obtain such a permit. And in Romer v. Evans, we disallowed a state statute that impos[ed] a broad and undifferentiated disability on a single named group — specifically, homosexuals. The dissent apparently agrees that if these cases have stare decisis effect, Texas’ sodomy law would not pass scrutiny under the Equal Protection Clause, regardless of the type of rational basis review that we apply.
Id., 123 S.Ct. at 2484-85 (emphasis added). An examination of these cases bears out Justice O’Connor’s point and their direct application here. Regardless of how one labels the rational-basis review employed in these cases, Florida’s ban on gay adoption is simply not compatible with them.
All four of these precedents involved legislation targeting politically unpopular groups to varying degrees: “hippies” (Moreno), unmarried users of birth control (Eisenstadt), the mentally disabled (Cleburne), and homosexuals (Romer). Moreover, in each case, the Court invalidated a law that had the effect of inhibiting personal relationships of one sort or *1293 another: among mentally disabled or unrelated persons who wished to share a common living space (Cleburne and Moreno); among unmarried individuals who wished to engage in intimate relations (Eisen-stadt); and among individuals who wished to live without fear of state-sanctioned discrimination prompted solely by their attachment to persons of the same sex (Romer).
In Moreno, the Supreme Court found that excluding individuals unrelated to other household members from the federal food stamp program was not rationally related to the government’s asserted interest in minimizing administrative fraud. 413 U.S. at 535, 93 S.Ct. 2821. In so finding, the Court observed that
even if we were to accept as rational the Government’s wholly unsubstantiated assumptions concerning the differences between “related” and “unrelated” households we still could not agree with the Government’s conclusion that the denial of essential federal food assistance to all otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns.
Id. at 535-36, 93 S.Ct. 2821. The Court pointed out that the statute already contained anti-fraud provisions and that it provided for strict criminal penalties. Id. at 536, 93 S.Ct. 2821. Furthermore, the Court found that in “practical effect,” the statute did not operate to further the prevention of fraud, since it only precluded groups that lived as one economic unit, shared common cooking facilities, and customarily purchased food in common. Id. at 537, 93 S.Ct. 2821. The Court found that individuals with the financial means to alter their living arrangements could avoid the exclusion by sidestepping any one of the three conditions. For example, two wealthy unrelated individuals living together could manage to purchase their groceries separately. In so doing, they would effectively create two separate households, both eligible for assistance, and thereby evade the application of the statute. Id. This being the case, it could not truthfully be said that the purpose of the exclusion was to eliminate the operation of fraud in the food stamp program. Instead, the statute irrationally punished “only those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility.” Id. at 538, 93 S.Ct. 2821.
In Eisenstadt, the Court invalidated on rational basis grounds a Massachusetts statute banning the distribution of contraceptives to unmarried persons. The state’s highest court had defined the statute’s purposes as the deterrence of premarital sex and the promotion of community health needs by regulating the distribution of potentially harmful articles. The Supreme Court looked behind the facial legitimacy of the state’s proffered justifications and refused to accept that either rationale could “reasonably be regarded” as the purpose of the statute. 405 U.S. at 448-49, 92 S.Ct. 1029. The Court found that the first purpose, deterring premarital sex, was “dubious” considering that Massachusetts law did not limit the distribution of contraceptives when used to prevent the spread of disease rather than to prevent pregnancy. Id. (internal quotation omitted). And in allowing married persons to use contraceptives, the state’s law made no effort to limit illicit sexual relations between married and unmarried persons. Thus, the proffered rational basis was “illogical to the point of irrationality.” Id. at 451, 92 S.Ct. 1029 (internal quotations omitted).[12]
*1294 The Court concluded that “the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim.” Id. at 449, 92 S.Ct. 1029. The Eisenstadt Court also discounted the state’s promotion of health argument as “both discriminatory and overbroad,” and a transparent effort to escape the reach of the Court’s holding in Griswold v. State of Connecticut, 881 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Eisenstadt, 405 U.S. at 450, 92 S.Ct. 1029. The Court held on equal protection grounds that “whatever the rights of the individual to access to contraceptives may be, the rights must be the same for the unmarried and the married alike.” Id. at 453, 92 S.Ct. 1029.
In Cleburne, the Court heard an equal protection challenge to a Texas city’s zoning ordinance that required a special use permit in residential areas for the operation of a home for the mentally disabled. The city argued that the ordinance was justified by the “negative attitude of the majority of property owners” toward institutions for the mentally disabled and by “the fears of elderly residents” living near the institution. 473 U.S. at 448, 105 S.Ct. 3249. It also defended the measure as an effort to serve the best interests of the mentally disabled themselves, arguing that the institution would be threatened by its location near a junior high school whose students might harass the residents, its setting on a flood plain, and its size and capacity. Finally, the city pointed to concerns over street congestion, fire hazards, neighborhood serenity, and potential liability arising out of the conduct of the mentally disabled. Id. at 449-50, 105 S.Ct. 3249.
Again applying rational basis review, the Supreme Court first rejected the city’s attempt to justify the statute by reference to a supposed communal aversion to the mentally disabled. “[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding,” the Court found, “are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like.” Id. at 448,105 S.Ct. 3249.
With respect to the city’s other arguments, the Court “did not discount the legitimacy of these interests, but rather found that, in creating the means used to carry out these interests, the city had adopted a classification that had no rational basis.” Williams v. Pryor, 240 F.3d 944, 952 (11th Cir.2001) (discussing Cle-burne ). The city’s fears that junior high school students would harass the residents could not be credited because the junior high school itself had thirty mentally retarded students in attendance. Cleburne, 473 U.S. at 449, 105 S.Ct. 3249. The concern of a possible flood was not tenable because the zoning ordinance allowed nursing homes, homes for the elderly, sanitariums, and hospitals to be located in the same area without permits. Id. The city’s fear of legal liability could not be credited because fraternities and boarding houses did not require a permit. Id. Moreover, fear of overcrowding in the institution was not reasonable when the city did not require permits to protect against crowding in other facilities. Id. at 450,105 S.Ct. 3249. Finally, there was no reason to believe that the institution would contribute to street congestion more than any other similar institution. What the Court *1295 said of this last argument applied with equal force to all of the city’s other rationales:
[T]his record does not clarify how ... the characteristics of the intended occupants of the Featherston home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes.

Id.

After discounting any connection between plausible legitimate government interests and the statute in question, the Court concluded that “[t]he short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded.” Id. In Cleburne, as in Eisenstadt, the Supreme Court indicated that it simply disbelieved that the purposes articulated by the state had any rational relationship to the ordinance and refused to accept the facial legitimacy of the city’s proffered reasons. The Court held that none of the goals fit the class of persons targeted except by way of confirming that animus towards the mentally disabled had been the major impetus behind the statute.
Finally, in Romer the Court extended rational basis review to the area of anti-homosexual discrimination. Colorado argued that the amendment struck down in that case was justified by the state’s interests in protecting the associational rights of landlords and employers with moral objections to homosexuality and in “conserving resources to fight discrimination against other groups.” 517 U.S. at 635, 116 S.Ct. 1620.
The Court found it “impossible to credit” these proffered purposes. Id. Noting that rational basis inquiry was meant to “ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law,” id. at 633,116 S.Ct. 1620, the Court held that
[ejven laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it.
Id. at 635, 116 S.Ct. 1620 (emphasis added). Because the amendment bore no credible relationship to the state’s proffered legitimate justifications, the Court accepted “the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.” Id. at 634, 116 S.Ct. 1620. And it concluded that, whatever else might be said of the amendment, it “offended” the “conventional and venerable” principle that “a law must bear a rational relationship to a legitimate governmental purpose.” Id. at 635, 116 S.Ct. 1620.
In all four cases, the Court concluded that the asserted justifications were not rationally related to the classification. Thus, the Court inferred that animus was the motivation behind the legislation and established that such a motivation could not constitute a legitimate state interest.[13] *1296 As Justice O’Connor noted in Lawrence, “if these cases have stare decisis effect, Texas’ sodomy law would not pass scrutiny under the Equal Protection Clause, regardless of the type of rational basis review that we apply,” 123 S.Ct. at 2485. So too does Florida’s law fail to survive any form of rational basis review. Here, there is no question that a politically unpopular group is being targeted, that the challenged legislation inhibits personal relationships, and that there is no legitimate rational relationship between Florida’s proffered justifications and its sweeping categorical adoption ban against homosexuals.

B. Subjected to the Identical Analysis Used in Eisenstadt, Cleburne, Moreno, and Romer, the Florida Ban Would be Unconstitutional.

Like the justifications for the statutes in the cases discussed above, Florida’s proffered justifications for the categorical ban here are false, do not rationally relate to the best interests of children, and are simply pretexts for impermissible animus and prejudice against homosexuals. The panel in Lofton credits the state’s assertion that the statutory ban is
designed to create adoptive homes that resemble the nuclear family as closely as possible. Florida argues that the statute is rationally related to Florida’s interest in furthering the best interests of adopted children by placing them in families with married mothers and fathers. Such homes, Florida asserts, provide the stability that marriage affords and the presence of both male and female authority figures, which it considers critical to optimal childhood development and socialization. In particular, Florida emphasizes a vital role that dual-gender parenting plays in shaping sexual and gender identity and in providing heterosexual role modeling. Florida argues that disallowing adoption into homosexual households, which are necessarily motherless or fatherless and lack the stability that comes with marriage, is a rational means of furthering Florida’s interest in promoting adoption by marital families.
358 F.3d at 818-19 (emphasis added).
This rhetoric boils down to the argument that Florida prohibits homosexuals from being considered as adoptive parents because it wishes to place children with married couples. It wishes to do so for two alleged reasons: (1) to provide “stability” in the home, which the panel apparently believes can only be provided by married couples representing the “nuclear” family model; and (2) to properly shape heterosexual “sexual and gender identity,” which the panel asserts should be accomplished by married couples.
*1297 Like the proffered reasons in Eisen-stadt, which were “so riddled with exceptions” that the state’s asserted goal could not “reasonably be regarded as its aim,” 405 U.S. at 449, 92 S.Ct. 1029, the state’s proffered rational basis for the statute here (providing adopted children with married couples as parents) cannot be legitimately credited because it fails the equal protection requirement that “all persons similarly situated should be treated alike.” Cleburne, 473 U.S. at 439, 105 S.Ct. 3249. As noted at the beginning of this dissent, it is plainly false that Florida has established a preference for “married mothers and fathers” as adoptive parents. The 1977 statute prohibiting homosexual adoption expresses no preference whatsoever for married couples, expressly permitting an “unmarried adult” to adopt. Fla. Stat. § 63.042(l)(b) (2003). Moreover, the DCF administrative regulations that are inextricably tied to Florida’s adoption statutes do not prefer married over single candidates for adoption.[14] In short, the Florida legislature never did, and the Florida executive no longer does, express a preference for married over unmarried couples or singles in the area of adoption. The fact that Florida places children for adoption with single parents directly and explicitly contradicts Florida’s post hoc assertion that the ban is justified by the state’s wish to place children for adoption only with “families with married mothers and fathers.” This contradiction alone is enough to prove that the state’s alleged reasons are “illogical to the point of irrationality.” Eisenstadt, 405 U.S. at 451, 92 S.Ct. 1029.
However, instead of acknowledging this glaring gap between the ban on homosexual adoption and the state’s purported justification, as did the Supreme Court in invalidating the statutes in Eisenstadt, Moreno, Cleburne, and Romer, the Lofton panel stretches mightily to construct a hypothetical to bridge this gap. “It is not irrational,” the panel opines, “to think that heterosexual singles have a markedly greater probability of eventually establishing a married household and, thus, providing their adopted children with a stable, dual-gender parenting environment.” Lofton, 358 F.3d at 822. The panel’s contrived hypothetical offering blatantly ignores not only the absence of any preference in Florida’s statute for married couples but also the realities of the adoption process. Evaluations of prospective parents are based on present, not “eventual,” status and conditions.[15] Florida does not ask for a commitment of plans to marry someday in the future and permits single adults to adopt without making inquiry into whether they have *1298 immediate, or even long-range, marriage plans or prospects. Indeed, that many individuals choose to adopt outside of marriage is an indication that adoption and commitment to a permanent adult relationship are completely separate decisions.[16] Moreover, experience leads one to believe that single heterosexuals who adopt are less likely to marry in the future, not more likely. Finally, this speculative hypothesis also fails to take account of “non-practicing homosexuals” who are not likely to marry but can adopt under Florida law.[17] The Supreme Court found the state’s arguments in Eisenstadt to be a futile and transparent move to escape the reach of the Court’s decision in Gris-wold. 405 U.S. at 450, 92 S.Ct. 1029. The hypothetical posited by the Lofton panel demonstrates a comparable and equally transparent attempt to ignore the equal protection cases applicable here.
In addition to its failure to meaningfully distinguish homosexuals from single heterosexuals, the panel never explains why it is rational to believe that homosexuals, as a class, are unable to provide stable homes and appropriate role models for children. With respect to the first of these arguments, there is absolutely no record evidence to show that homosexuals are incapable of providing the permanent family life sought by Florida. To the contrary, as the facts in this case suggest, many children throughout the country are lovingly and successfully cared for by homosexuals in their capacity as biological parents, foster parents, or legal guardians.[18] Furthermore, it is not marriage that guarantees a stable, caring environment for children but the character of the individual caregiver.[19] *1299 Indeed, given the reality of foster care in Florida, the statute actually operates to impede, rather than promote, the placement of a child into a permanent family. Florida’s statute expresses a clear intent “to protect and promote the well-being of persons being adopted ... and to provide to all children who can benefit by it a permanent family life.” Fla. Stat. § 63.022(3) (2003). Yet, Florida’s foster care system has a backlog of more than 3,400 children in it, far more than the number of married couples eligible to adopt.[20] Given this backlog, the state’s ban on gay adoption does nothing to increase the number of children being adopted, whether by married couples or anyone else. The state is evidently willing to allow children to live with the potential uncertainties of several foster-care placements rather than enjoy the security and certainty of an adoptive home with one or two earing parents who are also homosexual.[21]
Nor does the panel offer a reason for why it is rational to credit the state’s second argument: that homosexuals are incapable of providing good role models. The panel claims that “[heterosexual] children will need education and guidance after puberty concerning relationships with the opposite sex.... It is in the best interests of a child if his or her parents can personally relate to the child’s problems and assist the child in the difficult transition to heterosexual adulthood.” Lofton, 358 F.3d at 822 (quoting Cox, 627 So.2d at 1220, which predates La/mence and relies on Boivers). Is the panel suggesting that heterosexual parents are necessary in order to tell children about their own dating experiences after puberty? For anyone who has been a parent, this will no doubt seem a very strange, even faintly comical, claim. There is certainly no evidence that the ability to share one’s adolescent dating experiences (or lack thereof) is an important, much less essential, facet of parenting. The difficult transition to adulthood is a common human experience, not an experience unique to human beings of a particular race, gender, or sexual orientation. It is downright silly to argue that parents must have experienced everything that a child will experience in order to guide them. Indeed, that will generally not be the case. For example, immigrant parents help their children adjust to a world and culture they have not known. It cannot be suggested that such *1300 individuals are unfit to parent any more than it could be suggested that a mother is unfit to parent a son or that a white person is unfit to parent an African-American child.[22] Furthermore, the panel’s argument completely neglects to consider the situation of gay children of heterosexual parents. Children simply need parents who will love and support them.
In addition to this contrived argument about teenage dating advice, the panel suggests that placing children with homosexual parents may make it more likely that children will become homosexual, referring cryptically to the “vital role that dual-gender parenting plays in shaping sexual and gender identity and in providing heterosexual role modeling.” Lofton, 358 F.3d at 818 (emphasis added). In our democracy, however, it is not the province of the State, even if it were able to do so, to dictate or even attempt to influence how its citizens should develop their sexual and gender identities. This approach views homosexuality in and of itself as a social harm that must be discouraged, and so demeans the dignity of homosexuals, something that Lawrence specifically proscribes. Lawrence, 123 S.Ct. at 2482, 2484 (finding that gays and lesbians are “entitled to respect for their private lives.”).
Finally, the panel also intimates in dicta that Florida has a legitimate interest in defending public morality by expressing disapproval of homosexuality. Lofton, 358 F.3d at 819 n. 17. But moral disapproval of disfavored groups “is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause.” Lawrence, 123 S.Ct. at 2486 (O’Connor, J., concurring). Moreno established that “if the constitutional conception of ‘equal protection of the laws’ means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate government interest.” 413 U.S. at 534, 93 S.Ct. 2821. As the Lawrence Court made clear, “[o]ur obligation is to define the liberty of all, not to mandate our own moral code.” 123 S.Ct. at 2480 (quoting Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 850, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).
Nor may the state hide behind a suggestion that it is attempting to protect children from disapproval at large in society. Florida courts have specifically rejected moral disapprobation of homosexuality as a justification for granting custody of a child to one or another biological parent. See Maradie v. Maradie, 680 So.2d 538 (Fla.Dist.Ct.App.1996) (holding that a lower court’s finding as to the effect of a homosexual environment on a child is not a proper subject of judicial notice, and that it requires reversal and remand for a new custody determination); Jacoby v. Jacoby, 763 So.2d 410 (Fla.Dist.Ct.App.2000) (citing Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), and holding that a lower court’s reliance on perceived biases against homosexuality is an improper basis for a residential custody determination).
Ultimately, the breadth of the categorical adoption ban “outrun[s] and belie[s]” the state’s asserted justifications. Romer, 517 U.S. at 635, 116 S.Ct. 1620. As Moreno discounted the state’s asserted reason of protecting the public from fraud because the state had adequate anti-fraud provisions with strict penalties, Florida’s rationale should likewise be discounted, given that Florida has explicitly tailored provisions to protect children placed in adoptive homes. Florida Statute *1301 § 63.092(3) (2003) requires a preliminary and thorough home study of prospective adoptive parents and the state uses its full power to screen all applicants and bar adoption by anyone not deemed to be a fit parent. The adoption statute accords everyone other than homosexuals the benefit of an individualized consideration that is directed toward the best interests of the child. Child abusers, terrorists, drug dealers, rapists and murderers are not categorically barred by the adoption statute from consideration for adoptive parenthood in Florida.[23] On the other hand, individuals who take children into their care, including unwanted children, such as those who are HIV-positive, and who have raised them with loving care for years are categorically barred from adopting if they happen to be homosexual. In the context of adoption, this disparity of treatment on the face of the statute amounts to the purest form of irrationality.
Just as troubling, even where a foster relationship is comparable to the most stable and caring of biological parent-child relationships, the state may remove a child from that relationship simply because the parent is a homosexual.[24] In light of these considerations, it is no exaggeration to say that the best interests of the child not only fail to justify or support the ban on homosexual adoption, but that those interests are actually subordinated to the state’s evident need to discriminate on the basis of sexual orientation.
The Equal Protection Clause does not permit a classification of persons undertaken for its own sake. “[C]lass legislation ... [is] obnoxious to the prohibitions of the Fourteenth Amendment....” Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 30, 27 L.Ed. 835 (1883). When there is no reason to believe that the disadvantaged class is different, in relevant respects, from similarly situated classes, the Supreme Court has held that irrational prejudice can be inferred as the basis for a classification. Cleburne, 473 U.S. at 449-50, 105 S.Ct. 3249. Here, irrational prejudice can be inferred as the basis for this classification because there is no difference in relevant respects between single heterosexual persons and single homosexual persons with reference to the state’s purported justification for the ban in the statute. Moreover, when all the proffered rationales for a law are clearly and manifestly implausible, a reviewing court may infer that animus is the only explicable basis. Romer, 517 U.S. at 632, 635, 116 S.Ct. 1620. Since Florida’s rationale is not plausible given that single persons may adopt, the inference is obvious that Florida’s decision to single out homosexuals is based solely on anti-gay animus. Unsurprisingly, animus is just what the legislative history of Florida’s ban confirms.

C. Legislative History

The Florida statute was enacted after an organized and relentless anti-homosexual campaign led by Anita Bryant, a pop sing *1302 er who sought to repeal a January 1977 ordinance of the Dade County Metropolitan Commission prohibiting discrimination against homosexuals in the areas of housing, public accommodations, and employment. Bryant organized a drive that collected the 10,000 signatures needed to force a public referendum on the ordinance.[25] In the course of her campaign, which the Miami Herald described as creating a “witch-hunting hysteria more appropriate to the 17th century than the 20th,”[26] Bryant referred to homosexuals as “human garbage.”[27] She also promoted the insidious myth that schoolchildren were vulnerable to molestation at the hands of homosexual schoolteachers who would rely on the ordinance to avoid being dismissed from their positions.[28]
In response to Bryant’s efforts, Senator Curtis Peterson introduced legislation in the Florida Senate banning both adoptions by and marriage between homosexuals. The legislative history reveals the very close and utterly transparent connection between Bryant’s campaign and the Peterson bills. At the May 3, 1977 hearings of the Senate Judiciary Civil Committee, for example, Senator Peterson observed that “it is a possible problem, constantly in the news.”[29] Senator George Firestone commented that “this [gay rights controversy] has totally polarized [my] community unnecessarily.”[30] And Senator Don Cham-berlin explicitly tied the Bryant campaign to the proposed ban on homosexual adoption, arguing that the latter would never have arisen without the ruckus over the Dade County antidiscrimination ordinance.[31] The impetus for Florida’s adoption ban exactly parallels the impetus for the state constitutional amendment struck down in Romer. See Romer, 517 U.S. at 623-24, 116 S.Ct. 1620 (“The impetus for the amendment and the contentious campaign that preceded its adoption came in large part from [the campaigns against antidiscrimination] ordinances that had been passed in various Colorado municipalities.”); Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (legislative history indicative of purpose to prevent “hippies” and “hippie communes” from participating in food stamp program).
The Florida legislature’s intention to stigmatize and demean homosexuals is further confirmed by the passage, on May 30, 1977, of a House amendment that allowed for public disclosure of the reasons for a denial of an application for adoption. The explicit purpose of this amendment was to protect non-homosexual prospective parents whose applications were denied for reasons other than sexual orientation from the stigma of being thought to be homosexual.[32] The Senate provided added *1303 coverage against stigmatization for non-homosexual applicants with its May 31 amendment requiring courts, when dismissing a petition for adoption, to state with specificity the reasons for doing so.[33]
Throughout all of these proceedings, it could hardly be said that there was any discussion of the “best interests of the child” standard. The only legislator who bothered to inject the concept was Senator Chamberlin, who tried to block the bill, noting that there was no incompatibility at all between homosexuals and the best interests of children.[34] Another senator simply stated that “we have a responsibility to provide children with a wholesome atmosphere.” [35]
As the House and Senate gave their final approval to the Peterson bills on May 31, Senator Peterson stated that his bills were a message to homosexuals that “[wje’re really tired of you. We wish you would go back into the closet.”[36] On June 8, 1977, exactly one day after Dade County voters repealed the antidiscrimination ordinance,[37] the Governor of Florida signed the Peterson bills into law, in what can only be seen as a deliberate acknowledgment of the orchestration between Bryant’s campaign and the legislature’s actions.[38] In short, the legislative history shows that anti-gay animus was the major factor — indeed the sole factor — behind the law’s promulgation, thereby confirming that the standard of review in this case is controlled by Eisenstadt, Cleburne, Rom-er, and Moreno.
Whereas the Texas sodomy statute struck down in Laurrence treated homosexuals as criminals, Florida’s ban on gay adoption treats criminals with more dignity than homosexuals. Nothing more clearly raises the “inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected,” Romer, 517 U.S. at 634, 116 S.Ct. 1620, than this disparity of treatment.
II. SUBSTANTIVE DUE PROCESS
Although I believe that this case can be resolved solely on equal protection grounds, without considering Lawrence, I address the independent basis of substantive due process because Lofton incorrectly concludes that Lawrence did not recognize a fundamental right to or liberty interest in sexual privacy. As I explain below, Lawrence held that consenting adults have a right under the Due Process Clause to engage in private sexual conduct, including homosexual conduct. Because Florida’s law punishes the exercise of this right by denying all active homosexuals the ability to be considered as *1304 adoptive parents, we are required to subject Florida’s law to heightened scrutiny — not the cursory, attempted rational-basis analysis the panel employs. In addition to its failure to apply heightened scrutiny, the panel makes further errors of law in attempting to evade the application of Lawrence. It makes erroneous statements about the proper use of history and tradition in a substantive due process analysis, and mistakenly claims that Lawrence does not apply here because adoption is a privilege and not a right, and because Florida’s statute is a civil rather than criminal law. These reasons are not only unsupported by, but are directly contrary to, Supreme Court precedent.

A. Lawrence Reaffirmed a Fundamental Right or Liberty Interest to Engage in Private Intimate Sexual Conduct.

The doctrine of substantive due process requires, first, that every law must address in a relevant way only a legitimate governmental purpose.[39] In other words, no law may be arbitrary and capricious but rather must address a permissible state interest in a way that is rationally related to that interest. As a consequence, any law challenged as violating a fundamental right or liberty interest must survive rational-basis review.
However, the Supreme Court has found that some decisions are so fundamental and central to human liberty that they are protected as part of a right to privacy under the Due Process Clause, and that the government may constitutionally restrict these decisions only if it has more than an ordinary run-of-the-mill governmental purpose.[40] Included within this right to privacy is the ability to make decisions about private sexual matters.[41]
In invalidating the sodomy statute at issue in Lawrence, the Court reaffirmed this right of sexual privacy, finding that private homosexual conduct is likewise encompassed within it.[42] The Court stated *1305 that the Due Process Clause gives homosexuals “the full right to engage in [private sexual] conduct without intervention of the government.” Lawrence, 123 S.Ct. at 2484. There can be no doubt that the Court’s conclusion here is a binding holding. From the outset of its opinion, the Court stated that it had granted certiorari specifically to consider “[w]hether Petitioners’ criminal convictions for adult consensual sexual intimacy in the home violate their vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment? ” Id. at 2476 (internal quotation marks and citation omitted) (emphasis added). While the Court also granted certiorari to address whether Texas’s sodomy statute violated the Equal Protection Clause,[43] the Court explicitly decided to rest its holding on a substantive due process analysis because it found that if a sodomy law “remained] unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons.” Id. at 2482.[44] Accordingly, the Court wrote that the “case should be resolved by determining whether the petitioners were free as adults to engage in the private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment.” Id. at 2476.
In resolving this issue, the ' Court retraced its substantive due process jurisprudence by discussing the' fundamental rights cases of Griswold, Eisenstadt,[45] Roe, and Carey and emphasized the breadth of their holdings as involving private decisions regarding intimate physical relationships. Id. at 2476-77. Beginning with Griswold, the Lawrence Court found that its prior decisions confirmed “that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person” and “that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship.” Id. at 2477 (summarizing Gris-wold, Eisenstadt, Roe, and Carey).
Because of the existence of this right to make private decisions regarding sexual conduct, the Lawrence Court was compelled to overrule the anomaly of Bowers, which had failed to acknowledge this right in permitting Georgia to criminalize sodomy. See Bowers, 478 U.S. at 194-96, 106 S.Ct. 2841. Lawrence found that at the time of Bowers the Court’s prior holdings had already made “abundantly clear” that individuals have a right to make decisions *1306 “ ‘concerning the intimacies of their physical relationship^], even when not intended to produce offspring.’ ” Lawrence, 123 S.Ct. at 2483 (quoting Bowers, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)).[46] On this basis, the Court concluded that “Bowers was not correct when it was decided, and it is not correct today.” Lawrence, 123 S.Ct. at 2484.[47]
In overruling Bowers, Lawrence found that Bowers “misapprehended the claim of liberty there presented” when it framed the issue before it as whether the Constitution protects “a fundamental right to engage in consensual sodomy”:
To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in Bowers and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home.
Lawrence, 123 S.Ct. at 2478 (emphasis added). Just as marriage involves much more than simply the right to have sexual intercourse, the right to participate in a homosexual relationship extends far beyond the ability to engage in homosexual sodomy. Bowers was therefore wrong to have focused on a particular sexual act instead of upon the right to sexual privacy which encompasses acts of adult consensual sexual intimacy.
Lawrence indicated that the question that Bowers should have asked is whether adults have a right to engage in “private *1307 [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment.” Id. at 2476. In answering this question, Lawrence expressly adopted the reasoning of Justice Stevens’ dissent in Bowers:
[Individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of “liberty” protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.
Id. at 2483 (quoting Bowers, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)) (emphasis added) (internal quotation marks omitted). Because the private conduct at issue in Lawrence also concerned the “intimacies” of a “physical relationship,” the Court held that the petitioners have a right to engage in private sexual conduct without government interference. Id. at 2484.
The Lawrence Court’s answer to its question of whether adults have a right to engage in private sexual conduct — the question it granted certiorari to answer and which it found was necessary to resolve the case — is binding precedent and should control the outcome here. While the Lofton panel concedes that “substantive due process does not permit a state to impose a criminal prohibition on private consensual homosexual conduct,” Lofton, 358 F.3d at 815, it fails to consider the ramifications of such a holding. Without defining what other kind of right it could be, Lofton maintains that “it is a strained and ultimately incorrect reading of Lawrence to interpret it to announce a new fundamental right.” Id. at 817. Indeed, Lawrence did not establish a new fundamental right. Rather, given the Court’s statement that Bowers was not correct when it was decided, the Lawrence Court reiterated the longstanding right of consenting adults to engage in private sexual conduct.

B. Lofton’s Arguments for Why Lawrence is a Rational Basis Case are Unsupported by any Supreme Court Precedents.

In addition to its insistence that Lawrence did not announce a “new” right to sexual privacy, the panel offers four arguments for its skewed reading of Laivrence as a pure rational-basis decision. First, it claims that Laivrence did not “locate this right [to sexual privacy] directly in the Constitution.” Id. at 816. Second, it argues that Laivrence failed to provide the “careful description” of the asserted right required by Glucksberg. Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)) (internal quotation marks omitted). Third, the panel claims that Lawrence failed to identify a history and tradition of affirmative protection of the right to engage in homosexual conduct. Id. at 816 n. 15. Finally, the panel argues that Lawrence could not have recognized a fundamental right or liberty interest entitled to heightened scrutiny because of a single sentence in the opinion indicating that the Texas sodomy statute furthered no legitimate state interest. Id. at 817.
Regarding the panel’s first argument, as noted earlier, the Lawrence Court stated that the petitioners’ “right to liberty under the Due Process Clause gives them the full right to engage in their [private sexual] conduct without intervention of the government.” 123 S.Ct. at 2484 (emphasis added). The Court could not have been more clear that the petitioners’ right to engage in private sexual conduct was located in the Due Process Clause. Thus, the panel’s argument that Lawrence did not “locate this right directly in the Constitution” is meritless.
*1308 The panel’s second argument that Lawrence did not provide the “careful description” of the right required by Glucksberg is also untenable given that the Lawrence Court was at pains to describe how Bowers had misframed the question in that case in terms of whether there was a fundamental right to engage in consensual homosexual sodomy. As indicated above, Lawrence explained that the narrow framing of the question in Bowers “demean[ed] the claim” set forth and “diselose[d] the Court’s own failure to appreciate the extent of the liberty at stake” in that case. Id. at 2478 (.Bowers “misapprehended the claim of liberty there presented to it”). The Lawrence Court explained that “[t]he laws involved in Bowers and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home.” Id. (emphasis added). Thus, Lawrence demonstrates that the “careful description” of a liberty interest required by Glucksberg will not necessarily be synonymous with framing the liberty interest in the most narrow fashion possible. The panel has ignored this important clarification of the Glucksberg analysis required by the Court’s subsequent decision in Lawrence. Inexplicably, given its purported interest in a “careful description” of the asserted right, the panel also fails to recognize that part of Lawrence in which the Court clearly states what the right at issue is and is not about for purposes of guiding-future courts:
The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.
Id. at 2484.[48]
Third, the panel further ignores how Lawrence clarifies Glucksberg’s treatment of the role of history and tradition in identifying a fundamental right or liberty interest. The panel misreads Glucksberg to say that the only relevant historical inquiry is whether there has been a tradition of laws affirmatively protecting the conduct at issue. Lofton, 358 F.3d at 816 n. 15. The panel then argues that while Lawrence “devote[d] considerable attention to history and tradition,” it did so only to demonstrate that there had not been a “history of enacting, and regularly enforcing, laws specifically directed at private homosexual conduct.” Id. Apparently in the panel’s view, this was a superfluous inquiry, devoid of legal meaning. According to the panel, the Supreme Court should have asked “whether there has been a deeply rooted tradition and history of protecting the right to homosexual sodomy or the right to private sexual intimacy.” Id.
The panel’s belief that a history of state non-interference in the private sexual lives of homosexual adults cannot, as a matter *1309 of law, serve as the basis for recognizing a right to sexual privacy is entirely unsupported by any Supreme Court case. The panel has simply made up a new constitutional requirement that there must be a history of affirmative legislative protection before a right can be judicially protected under the Due Process Clause. Such a requirement ignores not only Laivrence, but an entire body of Supreme Court jurisprudence. Had the Supreme Court required affirmative governmental protection of an asserted liberty interest, all of the Court’s privacy cases would have been decided differently.[49] Equally significantly, the panel fails to heed the Lawrence Court’s instruction that “[hjistory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry.” 123 S.Ct. at 2480 (internal quotation marks and citation omitted). As Lawrence stated:
[Wje think that our laws and traditions in the past half century are of most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex.
Id. Thus, Laivrence elucidates the Glucks-berg discussion of the proper use of history and tradition in more than one sense. In addition to clarifying that' history and tradition do not themselves resolve the due process inquiry, Lawrence establishes that recent trends and practices are as important as more distant ones in defining the existence and scope of a liberty interest. The panel’s discussion of history and tradition is outdated in both of these respects.
Fourth and finally, the panel insists that, no matter how hard Lawrence tries, it cannot have involved a liberty interest that requires heightened scrutiny because of a single reference to the phrase “legitimate state interest” towards the end of the Lawrence opinion. Lofton, 358 F.3d at 817 (quoting Lawrence, 123 S.Ct. at 2484) (internal quotation marks omitted). The,sentence in question stated that “[tjhe Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.” Lawrence, 123 S.Ct. at 2484. The panel misconstrues even this solitary fragment of the Lawrence opinion. The mere presence of the phrase “legitimate state interest” does not mean that heightened scrutiny is not applicable, as can be seen by its use in conjunction with the application of heightened scrutiny. As the Supreme Court has explained, “[wjhere certain fundamental rights are involved, the Court has held that regulation limiting these rights may be justified only by a compelling state interest, and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.” Roe, 410 U.S. at 155, 93 S.Ct. 705 (emphasis added) (internal citations and quotation marks omitted).[50] Once the *1310 Lawrence Court found that the Texa-s sodomy statute completely proscribed the petitioners’ substantive right under the Due Process Clause, and that the law lacked any legitimate purpose, its inquiry was at an end. Heightened scrutiny requires a compelling state interest. The Lawrence Court clearly found that there was not even a conceivable legitimate state interest that could have sustained the Texas law.
The only way to avoid the conclusion that Lawrence recognized a fundamental right or liberty interest that requires heightened scrutiny is to deliberately refuse to give meaning to the overwhelming bulk of the words, phrases, sentences, and paragraphs used in Lawrence. Under the panel’s view, Lawrence is a one-sentence opinion with pages and pages of irrelevant dicta.[51] I submit that it is the panel in Lofton that constructs a “strained and ultimately incorrect reading of Lawrence.'’

C. Florida’s Adoption Ban is Subject to Heightened Scrutiny Because It Significantly Burdens the Right Identified in Lawrence.

Every precedent teaches that when the government directly burdens a fundamental right or liberty interest of the nature affirmed in Lawrence> heightened scrutiny applies. See, e.g., Roe, 410 U.S. at 155, 93 S.Ct. 705; Zablocki v. Redhail, 434 U.S. 374, 387-88, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (heightened scrutiny applies to direct and substantial burdens on due process right).[52] This heightened scrutiny requires that legislation be “narrowly drawn” to achieve a “compelling state interest.” Roe, 410 U.S. at 155, 93 S.Ct. 705.[53]
The panel argues essentially that, even if Lautrence affirmed a fundamental right or liberty interest, heightened scrutiny is not appropriate here, first, because adoption is a privilege and not a right under state law and, second, because Florida’s ban is the product of a civil rather than a criminal law.[54]
With respect to the panel’s first argument, the Supreme Court long ago rejected the rights/privileges distinction. See, e.g., Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (invalidating law that conditioned receipt of welfare benefits, a statutory privilege, on one-year residency requirement as an unconstitutional burden on right to interstate travel, and noting that “[t]his constitutional challenge cannot be answered by the argument that public as *1311 sistance benefits are a ‘privilege’ and not a ‘right.’ ”), overruled in part on other grounds by Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[55] Therefore, contrary to the panel’s suggestions, the refusal to extend a government benefit or privilege on non-discriminatory terms may indeed unconstitutionally burden the exercise of a fundamental right or liberty interest.
The panel’s second argument is also mistaken. See Lofton, 358 F.3d at 817 (distinguishing Lawrence because “[t]he relevant state action [here] is not criminal prohibition, but grant of a statutory privilege”). The need to closely scrutinize Florida’s justifications for burdening this right is not diminished because the burden in this case is the product of a civil statute, rather than a criminal law. Once a fundamental right or liberty interest has been established, the Supreme Court has stated that heightened scrutiny applies not only when a state punishes its exercise by means of a criminal statute, but also when a civil law directly and substantially burdens that protected right.
For example, the Court in Zablocki applied heightened scrutiny in striking down a civil law that prevented individuals who had not made child support payments from receiving a marriage license. 434 U.S. at 388-91, 98 S.Ct. 673. The Court found that the government was unable to show that the law was justified by “sufficiently important state interests” or that it was “closely tailored to effectuate only those interests.” Id. at 388, 98 S.Ct. 673. The Court explained that heightened scrutiny was appropriate because the law had “directly and substantially” burdened the right of poor people to marry. Id. at 387, 98 S.Ct. 673.
Similarly, in Shapiro, the Court struck down the civil laws of various jurisdictions which required that residents live within the jurisdiction for a year before receiving welfare benefits. 394 U.S. at 622-23, 642, 89 S.Ct. 1322. Even though the laws involved the receipt of a government benefit (welfare payments) rather than a right, the Court expressly rejected the application of rational-basis review. Id. at 627 n. 6, 89 S.Ct. 1322 (noting that “[t]his constitutional challenge cannot be answered by the argument that public assistance benefits are a ‘privilege’ and not a ‘right’ ”) (emphasis added). Instead, because the law “penalized” the fundamental right to interstate travel, the Court asked whether the *1312 law was “necessary” to achieve a “compelling governmental interest.” Id. at 634, 89 S.Ct. 1322.
Together, Zabloeki and Shapiro stand for the proposition that a court must analyze a civil law under heightened scrutiny when it either penalizes or severely burdens the exercise of a fundamental right. I submit that if heightened scrutiny was required given the nature of the civil burdens in Zabloeki and Shapiro, then such scrutiny must, a fortiori, apply in this case. After all, in Zabloeki, a person could marry after making his or her delinquent child support payment. And in Shapiro, a resident would be eligible to receive welfare payments (a government benefit like the ability to adopt) after living in the relevant jurisdiction for a year. But a person exercising his or her Lawrence right in Florida may never adopt. The categorical nature of this ban, which burdens the right to form intimate relationships only when it is exercised by homosexuals, requires the same close analysis that the Court gave to the laws analyzed in Zabloeki and Shapiro and warrants the very same result.[56] None of the three cases newly cited by Judge Birch in his Special Concurrence in an attempt to fill the gaps in the panel opinion rebuts this conclusion.[57]
In sum, given the Lawrence Court’s recognition of the fundamental nature of the liberty interest of consenting adults to engage in homosexual relationships, Florida’s statute must be subjected to heightened scrutiny. The statute in this case imposes a direct, substantial and severe burden on the right recognized in Lawrence. Florida’s adoption ban forces a choice between the right to participate in a consensual, private, intimate relationship and consideration for parenthood through adoption. In effect, under the Florida statute, homosex *1313 ual men and women must forgo the consideration given to all others to be adoptive parents in order to engage in conduct protected by the Fourteenth Amendment. The Constitution does not permit such a choice unless,- under heightened scrutiny, a compelling and narrowly tailored justification has been found. As demonstrated above, not only is there no compelling interest to justify the Florida adoption ban, but the law is not even rationally related to the governmental purposes asserted. As such, Florida’s ban on homosexual adoption fails both heightened scrutiny and rational basis review.

. For purposes of this statute, the term "homosexual'' is "limited to applicants who are known to engage in current, voluntary homosexual activity.” Fla. Dep't of Health & Rehab. Servs. v. Cox, 627 So.2d 1210, 1215 (Fla.Dist.Ct.App.1993), aff'd in relevant part, 656 So.2d 902, 903 (Fla.1995).

. Since 2000, Mississippi has statutorily prohibited "adoption by couples of the same gender.” Miss.Code Ann. § 93-17-3(2) (2000). In 1999, Arkansas adopted a regulation, not a statute, barring homosexuals from becoming foster parents, not adoptive parents. Ark. Reg. 200.3.2 (1999).

. R. at 124 (Stipulation at ¶¶ 24-25).

. See note 1 above.

. See 2000 Fla. Laws, ch.2000-139, § 30, Fla. Stat. § 39.623 (2003).

. R. at 24 (Defs.’ Mot. to Dismiss at 10).

. R. at 124 (Stipulation at ¶¶ 9-11).

. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

. U.S. Dep’t of Agric. v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

. Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

. As the Court explained, if the state genuinely considered contraceptives to pose a *1294 health risk, it would have banned their use by both married and unmarried persons. Protecting only single persons from the alleged dangers of contraceptives, and even then only when used to prevent pregnancy rather than the spread of disease, was "illogical to the point of irrationality.” Eisenstadt, 405 U.S. at 451, 92 S.Ct. 1029 (internal quotations omitted).

. Judge Birch incorrectly claims that I have argued that these cases stand for the proposition that rational-basis review should focus on the actual reasons for enacting a statute. See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1278-1280, 1281 n. 6, 1281-1282. On the contrary, I recognize that if Florida’s post hoc justifications were able to rationally account for its ban on homosexual adoption, then Florida’s law might be constitutional notwithstanding some evidence in the legislative record that the state's actual motivation was animus. Thus, the suggestion that I have invented some alternative ‘‘animus/analysis” theory is a com- *1296 píete distortion of my position. Id. at 1278-1279. Instead, I merely contend that the Supreme Court's decisions in Eisenstadt, Moreno, Cleburne, and Romer require that we examine Florida’s post hoc rationales to determine if there is some conceivable legitimate government interest that can plausibly account for Florida’s law. There is nothing novel about this kind of analysis. As Judge Birch himself recognizes, in certain circumstances, a court may infer that a statute is motivated by animus or irrational prejudice when the proffered rationales cannot rationally explain the actual operation of the statute. Id. at 1280-1281. Because animus and irrational prejudice are not legitimate governmental purposes, such a statute will fail rational-basis scrutiny. Id. at 1280-1282. I have simply applied these principles to the facts of this ease, as I am required to do in faithfully applying Supreme Court precedent. As I explain in detail below, I do not believe Judge Birch has offered any plausible explanation for Florida’s categorical determination that homosexuals are inherently and always unfit to serve as adoptive parents. I fail to see how any objective observer could think such a law is rational and consistent with the most basic, minimal notions of equal protection under law.

. Fla. Admin. Code Ann. r. 65C-16.005 (2004). It should also be noted that even under the earlier version of the DCF regulations unmarried couples were only barred from adopting jointly. Fla. Admin. Code Ann. r. 65C-16.005 (2002). As single persons, heterosexuals have never been categorically barred from adopting in Florida. The April 2002 revision of the regulations provided that DCF "will accept the application of single persons seeking to adopt a child.” This remains true under the current regulations. Defendants and plaintiffs agree that over twenty-five percent of adoptions out of foster care in Florida are by single people, and that in the district covering Miami-Dade County, this figure is over forty percent. R. at 124 (Stipulation at ¶¶ 24-25).

. In a different context, a much more plausible hypothetical clarifies the reality of placement on the basis of existing conditions. If an applicant were unemployed and had no immediate job prospects or other present means of financially supporting a child, no placement agency would even consider permitting an adoption in the hopes that "some day” the adopting parent would be able to obtain employment, even if the applicant were a college graduate or had other job skills. The relevant inquiry has to be the conditions into which the child will be placed now.

. That the state endorses adoption by single parents in the same fashion as married couples reflects the fact that the best interests of the child depend upon considerations other than access to a two-parent household. Indeed, in many cases homosexual couples can provide a stable, two-parent household that singles, by definition, cannot.

. Cox, 627 So.2d at 1215, held that for purposes of the statute at issue, the term "homosexual” is "limited to applicants who are known to engage in current, voluntary homosexual activity.”

. Yet another disturbing aspect of Florida’s ban is that, while permitting single persons to adopt, this statute could conceivably ban the homosexual partner of a biological parent from adopting the partner's biological child.

. The most recent U.S. Census Bureau statistics indicate that about 50% of first marriages for men under age 45 may end in divorce. The figures for the first marriages of women in the same age group range between 44 and 52%. Rose M. Kreider and Jason M. Fields, "Number, Timing, and Duration of Marriages and Divorces: Fall 1996,” Cunent Population Reports (P70-80) at 18. Washington, DC: U.S. Census Bureau, 2001. These statistics are confirmed by the findings of the National Center for Health Statistics, which released a report in 2001 finding that 43% of first marriages end in separation or divorce within fifteen years. Matthew Bramlett & William Mosher, “First Marriage Dissolution, Divorce, and Remarriage: United States,” Advance Data from Vital and Health Statistics (2001). As of 2001, Florida ranked with Mississippi as the state with the sixth highest divorce rate in the nation. U.S. Census Bureau, Statistical Abstract of the United States (2003) at 100. This ranking includes the District of Columbia but not California, Colorado, Indiana, and Louisiana, which did not report divorce statistics to the Census Bureau. As Florida Statute § 63.042(l)(b) makes explicit, the fact that two persons are married does not make them fit parents or tell us how or even whether they will fulfill the responsibilities of caring for children. There is nothing selective about the institution of marriage; all kinds of persons who would not be regarded as suitable adoptive parents are admitted to the responsibilities of marriage, and marriage does not insulate spouses or children from the neglect and abuse that occur within it. In its annual national report on child abuse and neglect mandated under the Child Abuse and Prevention and Treatment Act ("CAPTA”), the U.S. Department of Health and Human Resources found that 81% of the perpetrators were parents defined as birth parents, adoptive parents, and stepparents. Similarly, in Florida, the report indicates that 78% of all reported *1299 child maltreatment cases were committed by parents. See Admin, for Children & Families, U.S. Dep't of Health & Human Serv., Child Maltreatment 2002: Reports from the States to the National Child Abuse and Neglect Data Systems — National Statistics on Child Abuse and Neglect (2004). In 2002, a total of 121,-834 cases of domestic violence were reported to police law enforcement agencies in the state of Florida. Of that number, 26% (31,-874) of the victims were spouses while 8% (9,190) of the victims were children. See Fla. Statistical Analysis Ctr., Fla. Dep't of Law Enforcement, Florida Uniform Crime Report (1992-2002).

. R. at 124 (Stipulation at ¶ 15).

. In its August 2001 “Child and Family Services Review Final Assessment,” the U.S. Department of Health and Human Services found that Florida failed to meet the national standard for stability of foster care placements (measured in terms of the percentage of children who experience more than two placements during their first twelve months of placement). The same assessment found that, in over 40%> of the cases reviewed, Florida failed to meet its own statutorily specified permanency goals for children in its foster care system. (Florida law requires that a permanent living situation be sought for each child who has remained in out-of-home care for twelve consecutive months, and that progress towards this permanency goal be reviewed on a biannual basis.) Admin, for Children & Families (Region IV), U.S. Dep't of Health & Human Serv., Child and Family Services Review Final Assessment (2001) at 14-17.

. Nor, for example, could anyone responsibly suggest that priests must be married in order to provide marriage counseling, or that psychiatrists must have suffered every ill they treat.

. The statute's preliminary home study requirement includes a check of the DCF central abuse registry and statewide criminal records. Fla. Stat. § 63.092(3)(b) (2003). DCF administrative regulations and Florida's labor code (not the Florida adoption statute) bar those convicted of crimes against children and certain crimes of violence from adopting. But these same provisions permit persons with a felony conviction for physical assault, battery, or a drug-related offense to adopt if the offense was committed more than five years before. Fla. Admin. Code Ann. r. 65 C-16.005(9)(a)(3) (2003) (referencing Fla. Stat. § 435.045(l)(a)(l) & (2) (2001)).

. In response to the ACLU's June 2001 request for a guarantee that Doe would not be taken away from Lofton, the DCF responded that it "is left with no legal alternative but to make appropriate efforts to place [Doe] for adoption.” Appellees' Br. at 11 (quoting R4-132, Ex. G).

. See generally "Battle over Gay Rights,” Newsweek, June 6, 1977.

. Bill Paterson, "Fear Intense on Both Sides of Gay Rights Vote Tuesday,” Wash. Post, June 6, 1977.

. "Battle over Gay Rights,” Newsweek, June 6, 1977; Laura Benkov, Reinventing the Family: The Emerging Story of Lesbian and Gay Parents 83 (1994).

. "Battle over Gay Rights,” Newsweek, June 6, 1977.

. Tape recording of the Florida Senate Judiciary Civil Committee proceedings, May 3, 1977 (copy of original in the Florida State Archives).

. Id.

. Id.; see also Tape recording of the Florida House of Representatives Judiciary Committee proceedings, May 19, 1977 (copy of original in the Florida State Archives) (representative stating that "the majority of the committee supports Ms. Bryant and her move to do what she is doing.”).

. Tape recording of the Florida House of Representatives proceedings, May 30, 1977 (copy of original in the Florida State Archives).

. Tape recording of the Florida Senate proceedings, May 31, 1977 (copy of original in the Florida State Archives). This Senate amendment is now codified as Fla. Stat. § 63.142(3)(b) (2003).

. Tape recording of the Florida Senate Judiciary Civil Committee proceedings, May 3, 1977.

. Tape recording of the Florida Senate proceedings, May 11, 1977 (copy of original in the Florida State Archives).

. "Gay Bills Pass Both Chambers,” Florida Times Union, June 1, 1977. Senator Peterson is also quoted in this UPI report as stating that "[t]he problem in Florida is that homosexuals are surfacing to such an extent that they're beginning to aggravate the ordinary folks, who have a few rights of their own.”

. The antidiscrimination ordinance, however, has since been repassed by the Miami-Dade County Commission. See Miami-Dade County Code of Ord., Ch. 11A, Art. 1(1) (1997-98) ("It is hereby declared to be the policy of Dade County ... to eliminate and prevent discrimination in employment, family leave, public accommodations, credit and financing practices, and housing accommodations because of ... sexual orientation.”).

. Assoc. Press, June 8, 1977.

. Judge Birch is, thus, mistaken that I view substantive due process as always synonymous with fundamental-rights analysis. See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1285-1286. I agree that rational-basis review is also part of the doctrine of substantive due process. The source of my disagreement with Judge Birch is based on his attempt to artificially downgrade the Lawrence decision to a rational-basis holding, which, as I explain infra, fails to provides a coherent and plausible interpretation of the entire opinion.

. The Supreme Court has explained that this right includes the ability of adults to make decisions relating to marriage, Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); family relationships, Prince v. Massachusetts, 321 U.S. 158, 165-66, 64 S.Ct. 438, 88 L.Ed. 645 (1944); procreation, Skinner v. Oklahoma, 316 U.S. 535, 541-42, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); contraception, Griswold, 381 U.S. at 485-86, 85 S.Ct. 1678 and Eisenstadt, 405 U.S. at 453-55, 92 S.Ct. 1029; child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and Meyer v. Nebraska, 262 U.S. 390, 399-400, 43 S.Ct, 625, 67 L.Ed. 1042 (1923); and abortion, Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

. See, e.g., Carey v. Population Services Int'l, 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) and Griswold, 381 U.S. at 485-86, 85 S.Ct. 1678 (right to use contraception); Casey, 505 U.S. at 869, 112 S.Ct. 2791 (right to seek out an abortion).

. From its opening paragraph, the Court emphasized that
DQiberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence.... The instant case involves liberty of the person both in its spatial and more transcendent dimensions.
Lawrence, 123 S.Ct. at 2475.

. Unlike the sodomy statute at issue in Lawrence, which only applied to homosexual conduct, the Georgia statute in Bowers criminalized acts of sodomy engaged in by both heterosexuals and homosexuals. See Bowers v. Hardwick, 478 U.S. 186, 188 n. 1, 106 S.Ct. 2841, 92, L.Ed.2d 140 (1986). The Lawrence Court indicated that the sodomy statute before it could have been invalidated using an equal protection analysis. 123 S.Ct. at 2482. Indeed, this was the conclusion of Justice O'Connor in her concurrence. Id. at 2484-88 (O’Connor, J., concurring).

. The Lawrence majority went on to state 'that ''[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres.” 123 S.Ct. at 2482.

.Although Eisenstadt was decided on equal protection grounds, Lawrence noted that Ei-senstadt "went on to state the fundamental proposition that the law impaired the exercise of ... personal rights.” 123 S.Ct. at 2477. Further, while Lawrence cited Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), as an example of how Bowers had been cast into doubt, the Court immediately declined to decide the case under Romer’s equal protection rationale, instead insisting that the decision be resolved on substantive due process grounds. Id. at 2482.

. In overruling Bowers, Lawrence explained that
our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. ... "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one’s own concept of, existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."
Id. at 2481 (quoting Casey, 505 U.S. at 851, 112 S.Ct. 2791). The Court unequivocally stated that “[pjersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do. The decision in Bowers would deny them this right.” Id. at 2482.

. Given the Lawrence Court's statement in 2003, I fail to understand Judge Birch’s reliance on a footnote from the Supreme Court's 1977 decision in Carey, where the Court indicated in dicta that it had not "definitively answered” the extent to which the Due Process Clause protects the private sexual conduct of consenting adults. Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1281-1283 (citing Carey, 431 U.S. at 688 n. 5, 97 S.Ct. 2010). Obviously, Carey does not resolve in any way the meaning of a case that comes twenty-six years later. Nor does it prevent Lawrence from answering the very question posed in Carey 's footnote. As I discuss extensively in this dissent, Lawrence does precisely this in affirming the right of consenting adults to make private sexual decisions. As I also explain, this could not have been a new right. Carey's footnote notwithstanding, the Lawrence Court determined that its pre-Bowers decisions, properly understood from its later vantage point, had already recognized a right to sexual privacy. This is the only way to make sense of the Lawrence Court's statements that Bowers was "not correct when it was decided," and that its decisions before Bowers had already made "abundantly clear” that adults have a right to make decisions "concerning the intimacies of their physical relationship [s].” Lawrence, 123 S.Ct. at 2483-84 (internal quotation marks and citation omitted).

. Judge Birch makes inconsistent use of this passage. On the one hand, he uses it to argue that Lawrence cannot possibly extend to the facts of the instant case — an argument that, for reasons described in Part II.C below, is untenable. See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1285-1286. On the other hand, he overlooks this passage when it comes to arguing that Lawrence did not provide a careful description of the scope of the right at issue. Id. at 1283-1284.

. For instance, there was no lengthy tradition of protecting abortion and the use of contraceptives, yet both were found to be protected by a right to privacy under the Due Process Clause. In Roe, the Court's historical analysis of Anglo-American statutory and common law served to provide evidence of the relatively recent (late nineteenth-century) vintage of state restrictions on abortion, not to demonstrate a tradition of affirmative protection of the right to an abortion. 410 U.S. at 132-41, 93 S.Ct. 705. Despite the lack of a history of protecting the right to abortion, the Roe Court nevertheless held that the "right of privacy ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.” Id. at 153, 93 S.Ct. 705.

. As indicated by Justice Souter in Gludcs-berg, this heightened protection applies regardless of whether the protected right is expressly labeled as "fundamental.” 521 U.S. at 768 n. 10, 117 S.Ct. 2258 (Souter, J., concurring) ("Our cases have used various terms to refer to fundamental liberty interests,” including "basic liberty,” "constitutionally protected liberty interest," and "right") (internal citations and quotation marks omitted); Ca *1310 sey, 505 U.S. at 848, 112 S.Ct. 2791 (requiring heightened scrutiny of burdens on right to abortion without labeling right as "fundamental”).

. See also Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1283-1284 (arguing that the Lawrence Court "disposes of the case in a single sentence”).

. See also McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir.1994) (noting that when a "right merits substantive due process protection” it is protected against government actions regardless of the fairness of the procedures used).

. The only sexual privacy case where the Court did not use this language was Casey, where it analyzed civil burdens on a woman’s right to abortion, not an outright criminal ban. The Court found that a state regulation that had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus” would place an "undue burden” on the right to abortion and therefore be unconstitutional. Casey, 505 U.S. at 869, 112 S.Ct. 2791.

.Lofton, 358 F.3d at 809 ("Appellants' challenge cannot be viewed apart from the context in which it arises. Under Florida law, adoption is not a right; it is a statutory privilege ... [AJdoption law is unlike criminal law, for example, where the paramount substantive concern is not intruding on individuals’ liberty interests.”) (internal quotation marks and citation omitted).

. See also Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) ("[T]his Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a privilege.' ”); Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("The constitutional challenge cannot be answered by an argument that public assistance benefits are a privilege’ and not a right.’ ”); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ("[C]onstruction of the statute [cannot] be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant’s ‘right’ but merely a ‘privilege.’ It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.”); and Speiser v. Randall, 357 U.S. 513, 518, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) ("[Ajppellees are plainly mistaken in their argument that, because a tax exemption is a ‘privilege’ or ‘bounty,’ its denial may not infringe speech.”). See also Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("[T]he Court has fully and finally rejected the wooden distinction between ‘rights’ and ‘privileges’ that once seemed to govern the applicability of procedural due process rights.”); and Jones v. State Bd. of Educ. for State of Tennessee, 397 U.S. 31, 34, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970) ("[I]t is far too late to suggest that since attendance at a state university is a ‘privilege,’ not a ‘right,’ there are no constitutional barriers to summary withdrawal of the ‘privilege.’ ”).

. In Zabloeki and Shapiro, the Court applied heightened scrutiny using an equal protection analysis. This made sense given that the government had burdened the right of poor people to marry (Zabloeki), and had discriminated against new residents exercising their right to travel (Shapiro). Likewise, Florida’s statute creates two classes of citizens: one of whom (heterosexuals) is allowed to form intimate relationships without any penalties, while the other (homosexuals) must choose between being considered as an adoptive parent and the ability to enter or remain in an intimate relationship. Therefore, Zabloeki and Shapiro demonstrate that Florida’s law can be analyzed using heightened scrutiny under either the Equal Protection or Due Process clauses.

. See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at 1288-1289, 1289 n. 22. These three cases—Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003); City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67, (1999); and Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)—do not have any application to the issue before us. In Morales, a municipality passed an ordinance that allowed police officers to order individuals who were loitering on street corners to disperse if an officer reasonably believed that at least one of the individuals was a gang member. The Court invalidated the statute on vagueness grounds, finding that the ordinance "affords too much discretion to the police and too little notice to citizens who wish to use the public streets.” Morales, 527 U.S. at 64, 119 S.Ct. 1849. Thus, the Court never reached the issue of whether the city had violated a liberty interest in loitering, and so had no occasion to address the appropriate level of scrutiny for analyzing such a claim. The other two cases, Youngberg and Sell, involved individuals already in government custody, with very different implications for the liberty interests at stake. See Youngberg, 457 U.S. at 309, 102 S.Ct. 2452 (involving a severely mentally retarded adult in a state mental institution); Sell, 539 U.S. at 171, 123 S.Ct. 2174 (involving a prisoner opposed to forced anti-psychotic medication). Neither case says anything about the appropriate level of scrutiny for claims raised by autonomous, free adults making decisions about private sexual conduct.